UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

LOIS TURNER,

                    Plaintiff,

           -v-

TEMPTU INC., TEMPTU MARKETING INC., and
MICHAEL BENJAMIN,

                    Defendants.
------------------------------------------------------------------X

11 Civ. 4144 (JMF)

<u>OPINION AND ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _08/13/2013_

JESSE M. FURMAN, United States District Judge:

    This action arises out of a failed business relationship between Plaintiff Lois Turner and Defendants Temptu Inc., formerly known as Temptu Marketing Inc. ("Temptu"), and Michael Benjamin.  Turner alleges that after entering into a partnership agreement with her, Defendants stole her concept of a home-use airbrush makeup system, thereby breaching the parties' contract. Based on these allegations, Plaintiff asserts eight causes of action.  After the close of discovery, Defendants moved for summary judgment under Federal Rule of Civil Procedure 56, contending that the parties never entered into a legally binding contract and that all of Plaintiff's claims should be dismissed.  For the reasons set forth below, Defendants' motion for summary judgment is GRANTED and Plaintiff's Complaint is dismissed.

## BACKGROUND

    The following facts, taken from the Complaint and the admissible materials submitted by the parties, are viewed in the light most favorable to Plaintiff, as she is the non-moving party.

    This case involves a dispute over the invention and sale of a home-use, airbrush-applied makeup system.  Turner is a New Jersey resident with a degree in fine arts.  (Compl. ¶ 2; Turner Aff. Ex. 1).  She has worked as a graphic designer and art director for various cosmetic

companies and most recently was employed as an associate creative director for Coach, Inc.
(*Id.*).  Turner testified that in 1994, she first had the idea to create an inexpensive, portable, easy-
to-use cosmetic airbrush for home use.  (Turner Aff. ¶¶ 8-9).  As Turner testified, the cosmetic
airbrushes available at that time were "made of metal and heavy, and difficult to handle because
the liquid foundation was poured into an open vessel connected to the airbrush gun, requiring the
user to hold the airbrush carefully while applying the makeup to prevent spilling."  (*Id.* ¶ 7).  She
testified that after years of extensive research, she developed a cosmetic airbrush system (the
"Turner System") with three unique features.  (*Id.* ¶ 10).

First, her airbrush system used a "pod," which Turner described as "a self-contained
interchangeable plastic container that would store the liquid foundation."  (*Id.* ¶ 11).  "[I]n
contrast to other airbrushes" on the market, this "pod . . . would nest into the airbrush as a sealed
container and lock into the airbrush chamber.  The liquid would then be dispersed through the
airbrush gun without spilling."  (*Id.* ¶ 12).  Second, the Turner System utilized an airbrush "nib
or needle" that dispersed makeup through an extremely small opening at the front end of the
brush, which required no cleaning.  (*Id.* ¶ 13).  Third, her system incorporated a "single-action
trigger," which dispersed liquid at a controlled air flow and was simpler to use than "dual-action
trigger[s]" available on the market.  (*Id.* ¶ 14 (internal quotation marks omitted)).  Turner
testified that although the nib and single-action trigger were technologies that she had found
during her research, they had never before been used on an airbrush in the cosmetic industry.
(*Id.* ¶ 15).  During the course of her research, Turner also began to gather information about how
to set up a company to manufacture and sell her system and began to look for a business partner.
(*Id.* ¶¶ 16-17).  It was through this research that Turner and Defendant Benjamin met.  (*Id.* ¶ 18).

2

Temptu is a New York company that markets and sells cosmetics and cosmetic airbrushes.  (Benjamin Decl. ¶¶ 4-5).  Benjamin began his career in the cosmetics industry at Temptu in 1991.  (*Id.* ¶ 3).  Benjamin testified that he first had the idea of developing a cartridge-based home-use airbrush in the late 1990s, after seeing similar technology used in the craft industry.  (Benjamin Decl. ¶ 8; Sher Decl. Ex. 2 ("Benjamin Dep.") at 42:14-43:3, 79:18-80:10; 87:6-14; 98:13-99:2).  For a number of years, he attempted to develop a cartridge-based cosmetic airbrush system at Temptu, but after he failed to secure financing, he left the company with the hope of developing such a system on his own.  (Benjamin Dep. at 85:24-88:6).  In 2004, he returned to the company, first as a consultant and then as the president.  (Benjamin Decl. ¶ 20). In March 2004, he prepared a business plan for Temptu that included a proposal to "develop[ ] cartridge-based airbrush guns."  (Sher Decl. Ex. 7 at TEMPTU000684).  In 2005, Benjamin purchased the company and engaged experts to sketch concepts for a cartridge-based airbrush. (Sher Decl. Ex. 8 at TEMPTU000647).  He testified that the sole reason he was unable to develop a cartridge-based airbrush system at Temptu during this time period was because he could not secure investor financing.  (Benjamin Dep. at 80:6-23).

In 2003 or 2004, Turner came across Temptu's cosmetic airbrush system on the Internet and reached out to Benjamin to set up a meeting at Temptu's offices.  (Turner Aff. ¶ 18).  At the time, Benjamin worked as a consultant for Temptu.  At this meeting, Turner and Benjamin discussed whether Temptu could serve as Turner's vendor by supplying liquid foundation for the Turner System.  (*Id.* ¶ 19).  After this initial meeting, the parties were not in contact until 2006, when Turner reached out to Benjamin a second time to discuss forming a partnership to develop a home airbrush system together.  (Sher Decl. Ex. 5 ("Turner Dep.") at 58:2-15).  Shortly after their 2006 meeting, Turner introduced Benjamin to her former colleague, Roger Braimon.  (Sher

Decl. Ex. 5 at 92:14-12; Turner Aff. ¶ 26).  Braimon testified that Turner invited him to be her

equal partner in an airbrush venture and mentioned that Benjamin might be able to serve as their

vendor.  (Sher Decl. Ex. 12 ("Braimon Dep.") at 39:19-44:18).

Between September 2006 and August 2007, Turner, Benjamin, and Braimon

communicated by e-mail and met a number of times to discuss the possibility of working

together.  (Benjamin Dep. at 110:23-111:2; Turner Dep. at 161:18-162:2).  Turner testified that

in the course of these meetings, she told Benjamin about her idea for the Turner System,

although she did not have an operable prototype of the airbrush.  (Sher Decl. Ex. 4 ¶ 13; Pl.'s

56.1 Counter-Statement ¶ 20).  Benjamin testified that he was interested in working with Turner

because he believed that she could help him generate investment.  (Benjamin Dep. at 110:2-18).

Although Turner testified that she "worked tirelessly to complete a business plan with accurate

start-up costs and goals so that we could obtain a loan or financing" (Turner Aff. ¶ 22), she did

not realize that their partnership was contingent on her ability to raise capital (id. ¶ 74).

On September 18, 2006, Turner, Benjamin, and Braimon created a blog, which contained

information related to the ownership structure of the proposed company (under which Turner,

Benjamin, and Braimon would each hold one-hundred shares of the three-hundred share

company, with investor shares to be determined), the roles and responsibilities of the three

individuals, the voting requirements for company decisions, buy-out options, and how profits

would be shared if the company dissolved.  (Compl. Ex. B at 12-13).  The blog left a number of

terms "to be determined," including "the maximum percent of shares an individual shareholder

or company can have," how the parties would determine the value of the company at the time of

a buyout, and shareholder compensation.  (Id. at 12-14; Turner Dep. at 116:3-13).  While Turner

testified that the blog contained the terms of their oral partnership agreement and "served as a

living document for [them] to write, edit, and memorialize [their] discussions" (Turner Aff. ¶ 28), she also acknowledged that it was an "editable" working document, which was "constantly changing and being modified" (Turner Dep. at 93:4-94:-11).  Although Benjamin printed out, saved, and made handwritten notes to a version of the blog, the parties never signed it.  (Turner Aff. Ex. 11).  Further, the parties agreed that if they decided to finalize their agreement, they would sign a formal, written document.  (Turner Dep. at 101:13-104:8, 128:22-24).  Although Turner and Braimon met with a lawyer about drafting such an agreement, they never engaged the lawyer and no agreement was ever prepared.  (Sher Decl. Ex. 13 at TURNER000150).

        In 2007, before Turner, Benjamin, and Braimon had identified any potential investors for their new company (Benjamin Decl. ¶¶ 33-34), Benjamin's father-in-law Leonard Mandor approached him about investing (Benjamin Dep. at 155:19-24).  Benjamin advised Turner and Braimon about Mandor's interest.  (Sher Decl. Ex. 14; Benjamin Dep. at 157:6-19).  In or about July 2007, Mandor made it clear to Benjamin that he intended to invest but that the investment should go to Temptu rather than a brand new company.  (Benjamin Decl. ¶ 38; Benjamin Dep. at 154:10-19).  In an e-mail dated July 30, 2007, Benjamin informed Turner about Mandor's investment and invited her to join Temptu with an opportunity to become a shareholder.  (Benjamin Dep. at 158:22-159:7).  He wrote, "I realize that when we first started meeting with each other the goal was to partner equally and go out and find an investor.  However, as soon as I received the funding, I thought I made myself clear that partnership on that level was no longer a possibility.  After our last meeting, I realized that I must not have been clear enough." (Turner Aff. Ex. 25).

In an e-mail dated August 2, 2007, Benjamin reiterated his decision to develop the airbrush system through Temptu, rather than through a partnership with Turner and Braimon, explaining:

> Temptu cannot give up 40% of the consumer business to you and [Braimon] without a capital investment. I would like to try to work out a package which would include bonus and stock options that would excite you to come aboard Temptu. When we first started talking you mentioned that you might have investment capital to start this business. I would love for that to be a way we can become partners and work out a larger percentage of the consumer division for you.

(Turner Aff. Ex. 26). Benjamin also advised Turner that Temptu was working with an engineer, Gennadi Fedorov, to "develop products." (Benjamin Dep. at 158:22-159:7; Compl. Ex. C. at 5-6).[1] Turner and Braimon both declined Benjamin's offer of employment and wished him luck. (Turner Aff. Ex. 25; Sher Decl. Ex. 16).

Temptu subsequently engaged Fedorov to create a cartridge-based, portable cosmetic airbrush system that the company could patent. (Benjamin Decl. ¶¶ 43-45; Sher Decl. Ex. 18 at 115:18-116:3; Benjamin Dep. at 68:9-15). The company spent seven to eight million dollars developing this product over the course of the next two years. (Benjamin Decl. ¶ 47). Fedorov testified that the sketches and concepts he used to develop the airbrush system were his own work product, and that Benjamin did not contribute anything to the "invention, design, or the engineering of the Temptu home portable system." (Sher Decl. Ex. 18 at 116:12-25). Temptu introduced the product to the market in the fall of 2009 (Benjamin Dep. at 198:24-199-2), and in January 2012, the United States Patent and Trademark Office granted Temptu's application for four patents relating to the cartridge-based airbrush, identifying Fedorov as the inventor of the

---

[1] Turner testified that in September 2006, she told Benjamin about Fedorov and expressed her strong interest in having him work with them. (Turner Aff. ¶ 32). At the time, Benjamin gave her no indication that he had any prior awareness of Fedorov or his work. (*Id.*).

technology.  (Sher Decl. Exs. 19-22).  Although Turner was aware that Temptu had applied for patents, she never asserted any objections.  (Tuner Dep. at 184:7-185:14; Benjamin Decl. ¶ 52).

In December 2010, Turner saw Temptu's airbrush for sale at a shopping mall.  (Turner Aff. ¶ 57).  She commenced this action in June 2011, asserting eight causes of action: breach of contract, breach of fiduciary duty, negligent misrepresentation, misappropriation of ideas, unjust enrichment, fraudulent inducement, fraudulent concealment, and unfair competition.  (Compl. ¶¶ 41-94).  She also seeks preliminary and permanent injunctive relief, "enjoining and restraining Benjamin and Temptu's wrongful use of the Turner Plan, sale of the Home System and other wrongful and unlawful acts."  (Compl. ¶ 99).  Defendants have moved for summary judgment on all of Plaintiff's claims.

## STANDARD OF REVIEW

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013).  A dispute about a material fact is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). Affidavits submitted in support of or in opposition to summary judgment must be based "on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## DISCUSSION

### A. Breach of Contract

Plaintiff's first claim is that she and Benjamin "were joint venturers by express and implied contract," and that Benjamin breached the parties' agreement when he terminated their partnership and marketed the airbrush system through Temptu. (Compl. ¶¶ 45-47). Under New York law, there are four elements of a cause of action for breach of contract: (1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages suffered as a result of the breach. *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011). Defendants argue that Turner's claim fails at the first step because no reasonable jury could find that the parties entered into a legally binding contract. Turner, in turn, argues that the blog is an enforceable contract that created a joint venture between the parties.[2] After a

---

[2]     It is unclear whether Turner asserts that the parties entered into a partnership or joint venture agreement. (*Compare* Compl. ¶¶ 41-49 (alleging breach of joint venture) *with* Pl.'s Mem. in Opp'n 2-4 (alleging breach of partnership)). Nonetheless, the distinction is irrelevant here because under New York law, "joint ventures are governed by the same legal rules as

careful examination of the record, the Court concludes that Turner has failed to present evidence from which a reasonable jury could find that the parties formed a contract.

"To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms. There must be an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Tractebel Energy Mktg., Inc. v. AEP Power Mftg.*, 487 F.3d 89, 95-96 (2d Cir. 2007). Here, Turner argues that the parties entered into an express agreement through the blog, which detailed "virtually all aspects of the parties' relationship, including ownership percentages, voting, roles and responsibilities, rights upon dissolution, the skills to be contributed by each, management and control, and many other aspects of how [the parties] would conduct business together." (Pl.'s Mem. in Opp'n 4) Yet the record is clear that the parties did not agree to all material terms of their agreement; specifically, they did not agree as to how losses would be shared, which is "indispensable" to the formation of a joint venture. *See Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (internal quotation marks omitted).

To form a joint venture in New York, "[i]t is not enough that the parties have agreed to act in concert to achieve some stated economic objective." *Abbas Corp. (PVT) Ltd. v. Michael Aziz Oriental Rugs, Inc.*, 820 F. Supp. 2d 549, 554 (S.D.N.Y. 2011) (internal quotation marks omitted). Instead, a party must establish that:

> (1) two or more persons . . . enter[ed] into a specific agreement to carry on an enterprise; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge[,] or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses.

partnerships because a joint venture is essentially a partnership for a limited purpose." *Scholastic, Inc. v. Harris*, 259 F.3d 73, 84 (2d Cir. 2001).

*Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403, 411-12 (S.D.N.Y. 2011) (citing *Dinaco*, 346 F.3d at 67-68).  "[T]he absence of any one of these elements is fatal to the establishment of a joint venture." *Id.* (internal quotation marks omitted).

Here, there was no agreement to form a joint venture, as Turner acknowledged in her deposition that the parties never discussed — let alone agreed on — how the parties would share any losses.  (Turner Dep. at 131:11-13 ("Did you ever discuss what would happen if the company lost money?" "No.")).  *See Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 175 (S.D.N.Y. 2004) ("Thus, as the parties had never even discussed losses, certainly they did not have an agreement to share losses.").  Plaintiff urges the Court to infer an agreement to share losses because the parties discussed partnering "equally" and "all other elements of partnership are present" (Pl. 56.1 Counter-Statement ¶ 9; Pl.'s Mem. in Opp'n 3-4), but the law in this Circuit is clear that a joint venture cannot be formed if the parties did not agree to share in the losses of their enterprise.  *See Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 702 (2d Cir. 1990); *see also Goureau v. Goureau*, No. 12 Civ. 6443 (PAE), 2013 WL 417353, at *5 (S.D.N.Y. Feb. 4, 2013) (holding that the parties had not formed a joint venture because they  did not agree "to share in the losses of the joint venture," and "shared profits are simply not enough"); *Fetter v. Schink*, 902 F. Supp. 2d 399, 404 (S.D.N.Y. 2012) (same).

Plaintiff cites several cases from 1929 through 1958 for the proposition that a partnership may exist in the absence of an express agreement to share losses.  (*See* Pl.'s Mem. in Opp'n 3 n.10).  Significantly, however, these cases all pre-date the 1958 New York Court of Appeals' decision in *Steinbeck v. Gerosa*, 151 N.E.2d 170, 178 (N.Y. 1958), in which the Court held that "[a]n indispensable [element] of a contract of partnership or joint venture, both under common law and statutory law, is a mutual promise or undertaking of the parties to share in the profits of

the business and submit to the burden of making good the losses." Since then, New York state courts as well as federal courts in this Circuit have consistently held that an agreement to share losses is an essential element of a partnership or joint venture agreement. *See, e.g.*, *Itel*, 909 F.2d at 701; *Artco, Inc. v. Kiddie, Inc.*, No. 88 Civ. 5734 (MJL), 1993 WL 962596, at *8 (S.D.N.Y. Dec. 28, 1993) (noting that it is "disingenuous" to contend that "New York law is unclear on whether the sharing of losses is a requisite of a joint venture").

In any event, even if the blog contained all the material terms of a joint venture agreement, no rational juror could conclude that both parties intended to be bound by them. The "key question" in determining whether a binding contract exists is whether the parties "exhibited an intent to contract." *Zheng v. City of N.Y.*, 973 N.E.2d 711, 723 (N.Y. 2012) (internal quotation marks omitted). Here, although the parties' blog contained a number of contract terms, the parties never finalized these terms. (*See* Turner Dep. at 99:24-100:12). Further, several items were listed as "to be determined" (Compl. Ex. B 12-14; Turner Dep. at 116:6-13), Benjamin did not sign the blog (Turner Aff. Ex. 11; Turner Dep. at 101:2-102:18), and there is no evidence he orally agreed to accept its terms (*see* Benjamin Dep. at 224:13-225:5). Indeed, Turner acknowledged that as late as April 2007, their agreement was not finalized, as there were "still some discussion that needed to take place with respect to the contents of [their] contract" (Turner Dep. at 126:23-127:2; *see also* Turner Aff. Exs. 20, 21 (Turner stating that she could "bring a suggestion for a contract/agreement" to the parties' meeting)). In that same month, Braimon sent an e-mail to a lawyer, stating that the parties had yet to "establish a contract" and were still "undecided" on the "actual product" they would develop together. (Sher Decl. Ex. 14). Finally, when asked at her deposition if the parties had *ever* finalized their agreement, Turner responded, "No.  I would have loved to." (Turner Dep. at 99:24-25). Given this record, no

11

reasonable jury could find that the parties contracted to form a joint venture or partnership, or, indeed, had any legally binding agreement at all.

In the alternative, Turner argues that the parties' communications and conduct created an implied-in-fact contract.  (Pl.'s Mem. in Opp'n 6-9).  "Under New York law '[a] contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of the parties as indicated by their conduct.'"  *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 506-07 (2d Cir. 2009) (brackets in original) (quoting *Jemzura v. Jemzura*, 36 N.Y.2d 496, 503-04 (1975)). Nonetheless, like any contract, an implied-in-fact contract "'requires such elements as consideration, mutual assent, legal capacity and legal subject matter.'"  *Id.* at 507 (quoting *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 93-9 (1999))).  As explained above, the parties never finalized their agreement, nor consented to its terms, and never agreed to a provision of sharing losses. Thus, no implied contract was formed.  *See Leibowitz*, 584 F.3d at 507.

In short, Plaintiff has failed to raise a triable issue of fact as to the existence of a contract because the evidence in the record unequivocally demonstrates that Turner and Benjamin never reached a meeting of minds regarding their alleged agreement.  Accordingly, Defendants' motion for summary judgment on Plaintiff's breach-of-contract claim is granted.

## B.  Breach of Fiduciary Duty and Negligent Misrepresentation

In Count Two, Plaintiff alleges that Benjamin breached his fiduciary duty to Turner by "leading her on as if they were partners" and then "stealing her idea for a lightweight, easy-to-use consumer airbrush."  (*See* Compl. ¶¶ 50-55).  Under New York law, "[t]he elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing

12

breach of that duty; and (iii) damages resulting therefrom." *Johnson*, 660 F.3d at 138.  Here,

Plaintiff fails to establish that Benjamin owed her a fiduciary duty.

"[A] fiduciary relationship may arise [i] where the parties to a contract specifically agree

to such a relationship, or [ii] if one party's superior position or superior access to confidential

information is so great as virtually to require the other party to repose trust and confidence in the

first party." *Poon v. Roomorama, LLC*, No. 09 Civ. 3224 (RMB), 2009 WL 3762115, at *4

(S.D.N.Y. Nov. 10, 2009) (brackets in original) (internal quotation marks omitted).  To establish

superior knowledge, a plaintiff must prove that the information was peculiarly within the

knowledge of the defendant, and that the information was not such that could have been

discovered through the "exercise of ordinary intelligence." *Gray v. Wackenhut Servs., Inc.*, 721

F. Supp. 2d 282, 292 (S.D.N.Y. 2010).  Further, "[w]ith respect to a fiduciary duty created by

one party's trust and confidence in another party, the requisite high degree of dominance and

reliance must have existed prior to the transaction giving rise to the alleged wrong, and not as a

result of it." *Poon*, 2009 WL 3762115, at *3 (internal quotation marks omitted).  As noted

above, Plaintiff has failed to establish the existence of any contract that would give rise to a

fiduciary duty.  *See id.* (dismissing a claim for breach of fiduciary duty when the "[p]laintiff

d[id] not appear to have committed to the sharing of any losses").  Moreover, there is no

evidence in the record that a fiduciary relationship existed between Turner and Benjamin apart

from their alleged business venture.  Turner does not allege — and there is no evidence in the

record — that she had a prior relationship with Benjamin, or that he held a "superior position or

superior access to confidential information so great as virtually to require [her] to repose trust

and confidence in [him]." *See Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of*

*America Secs., LLC*, 592 F. Supp. 2d 608, 624 (S.D.N.Y. 2009) (internal quotation marks omitted).

Turner nevertheless argues that a fiduciary relationship arose because "Turner and Defendants met repeatedly, exchanged many emails, and spoke in confidence about a new business idea they were to pursue together." (Pl.'s Mem. in Opp'n 11). The law is clear, however, that "[m]ere . . . negotiations, which never even came to fruition, can hardly be the basis of a fiduciary relationship." *Musalli Factory for Gold & Jewelry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 27 (S.D.N.Y. 2009). Further, the Second Circuit has cautioned that "a fiduciary obligation is not to be lightly implied, lest it undercut [certain] basic principles of commercial law," including the principle that a party to a contract cannot be held liable for fraud "if he simply fails to disclose information that he is under no obligation to reveal." *United States v. Skelly*, 442 F.3d 94, 97-98 (2d Cir. 2006). Accordingly, because no reasonable jury could find that Defendants owed Turner a fiduciary duty, Turner's claim for breach of fiduciary duty is dismissed. Because "'under New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty,'" *Prime Mover Capital Partners, L.P. v. Elixir Gaming Tech., Inc.*, 793 F. Supp. 2d 651, 674 (S.D.N.Y. 2011) (quoting *Stewart v. Jackson & Nash*, 976 F.2d 86, 90 (2d Cir. 1992)), Plaintiff's negligent misrepresentation claim is also dismissed. *See Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 327 (S.D.N.Y. 2012).

## C. Misappropriation of Ideas and Unjust Enrichment

In Count Four, Turner alleges that Defendants misappropriated her novel and original idea to develop "a home airbrush system with better design, better function, a better product than the professional system." (Turner Dep. at 50:17-25; *see* Compl. ¶¶ 62-67). "To succeed on [a

14

misappropriation of an idea] claim under New York law, a party must prove (1) the existence of a legal relationship between the parties in the form of a fiduciary relationship, an express or implied-in-fact contract, or quasi-contract; and (2) the idea must be novel and concrete." *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05 Civ. 9292 (DLC), 2008 WL 463884, at *20 (S.D.N.Y. Feb. 20, 2008).  As discussed above, Turner fails to establish the first element — a legal relationship between the parties — and there is insufficient evidence to give rise to a fiduciary relationship. *See Hudson & Broad, Inc. v. J.C. Penney Corp., Inc.*, No. 12 Civ. 3239 (KBF), 2013 WL 3203742, at *7 (S.D.N.Y. June 18, 2013).  This failure alone is sufficient to dismiss the misappropriation claim.  Even if Turner had established this element, however, she has failed to establish the novelty of her idea.

 "The test for novelty is rather stringent, the idea must show true invention and not a mere adaptation of existing knowledge." *Broughel v. Battery Conservancy*, No. 07 Civ. 7755 (GBD), 2010 WL 1028171, at *4 (S.D.N.Y. Mar. 16, 2010).  An idea is not novel if it was "already in use in the industry at the time of plaintiff's submission or if the defendant had already used that idea." *Id.*  In opposing summary judgment on an idea misappropriation claim, a plaintiff, "who bears the burden of coming forward with proof of novelty, cannot rest on mere assertions of novelty and originality, but must instead demonstrate some basis in fact for those claims." *Sit-Up Ltd.*, 2008 WL 463884, at *20 (quotation marks omitted); *see also Broughel*, 2010 WL 1028171, at *4 ("Without sufficiently providing specificity as to how plaintiff's ideas are novel or a true invention . . . plaintiff cannot maintain her claim of misappropriation of ideas.").

Turner argues that her novel idea consisted of the "pod" system that would "contain the liquid in the airbrush so it would not spill and create a mess," and the concept for a consumer-friendly cosmetic airbrush.  (Pl.'s Mem. in Opp'n 13).  Neither of these ideas is sufficiently

novel for Turner's claim to survive this motion, as the Second Circuit has made clear that an idea "must show[ ] genuine novelty and invention, and not a merely clever or useful adaptation of existing knowledge in order to be considered original or novel."  *Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 378 (internal quotation marks omitted).  Here, Turner acknowledged in an e-mail that her "home use kit" was simply a plan to "knock[ ]-off" one of the airbrushes she found online (Sher Decl. Ex. 1), and she testified that her idea was "to improve upon" products that were already in the market, "[u]sing technology available in other airbrushes" (Turner Dep. at 71:9-25).  Further, her "pod" system was not novel, as Plaintiff admitted that it was no different from a system that employs a "cartridge" or "chamber" to store liquid (*id.* at 61:20-23), for which there were numerous patents issued before Turner communicated her ideas to Defendants.  (Sher Reply Decl. Exs. 1-5).

Plaintiff also cites two cases, *Bede v. Arvintz*, 175 F. Supp. 845, 847 (E.D.N.Y. 1959) and *Mumm v. Jacob E. Decker & Sons*, 301 U.S. 168, 171 (1937), for the proposition that the issuance of a patent is *prima facie* evidence of the novelty of the underlying idea.  (Pl.'s Mem. in Opp'n 14 n.66).  In the fifty-four years since *Bede* was decided, however, the case has never been cited for that proposition, and in the seventy-six years since *Mumm* was decided, it has never been cited in the context of a misappropriation claim, let alone a claim for misappropriation of ideas under New York law.  In any event, even if the issuance of patents to Temptu constituted *prima facie* evidence of novelty of Temptu's airbrush, this evidence is insufficient to defeat summary judgment given the overwhelming evidence in the record suggesting that the Turner system was not novel, and the evidence that the airbrush Temptu developed was not a stolen version of the Turner System.  (Sher Decl. Ex. 18 at 116:12-25).

In light of this evidence, the Court finds that Plaintiff's airbrush design consisted of nothing more than a "clever or useful adaptation of existing knowledge." *Nadel*, 208 F.3d at 378.  Accordingly, the requisite element of novelty is lacking, and her misappropriation claim is dismissed.  *See Sharp v. Patterson*, No. 03 Civ. 8772 (GEL), 2004 WL 2480426, at *9 (S.D.N.Y. Nov. 3, 2004) ("[W]here an idea consists in essence of nothing more than a variation on a basic theme[,] novelty cannot be found to exist." (ellipses and internal quotation marks omitted)); *Ring v. Estee Lauder*, 702 F. Supp. 76, 78 (S.D.N.Y. 1988), *aff'd*, 874 F.2d 109 (2d Cir. 1989) (granting summary judgment for defendant where an idea was just the "improvement of standard technique or quality . . . more of the nature of elaboration and renovation than of innovation" (brackets omitted)).

For substantially the same reasons, Turner's unjust enrichment claim fails.  "An unjust enrichment claim rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009) (internal quotation marks omitted).  To establish this claim, a plaintiff "must show that the defendant was enriched at the plaintiff's expense and that equity and good conscience require the plaintiff to recover the enrichment from the defendant." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 176-77 (2d Cir. 2012) (internal quotation marks omitted).  "Where an unjust enrichment claim is premised on a plaintiff's submission of an idea to a defendant, the plaintiff must demonstrate the novelty of the idea in order to recover." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 726 F. Supp. 2d 291, 304 (S.D.N.Y. 2010); *see also Khreativity Unlimited v. Mattel, Inc.*, 101 F. Supp. 2d 177, 182 (S.D.N.Y. 2000) (same).

17

Accordingly, because the Court has found that Turner's ideas were not novel, her unjust enrichment claim is also dismissed.[3]

**D.  Fraudulent Inducement and Fraudulent Concealment**

The Court next considers Turner's claims for fraudulent inducement and fraudulent concealment.  To prevail on a claim for fraudulent inducement under New York law, a plaintiff must prove that (1) the defendant made a knowing misrepresentation of material present fact, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of its reliance.  *Cohen*, 874 F. Supp. 2d at 327.  "A claim for fraudulent concealment requires the same showing as that for fraudulent misrepresentation, with the additional requirement that the plaintiff must demonstrate that the defendant had a duty to disclose material information."  *Id.* (citing *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 153 (2d Cir. 1995)).  To survive summary judgment on either of these fraud-based claims, each element must be shown by "clear and convincing evidence."  *Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 558 (S.D.N.Y. 2009).  "This evidentiary standard demands a high order of proof . . . and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory."  *Century Pac, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x. 496 (2009) (ellipsis in original) (internal quotation marks omitted); *see id.* ("[T]he evidence presented by the non-moving party in opposition to summary judgment must be enough

---

[3]     In her Complaint, Turner also seeks "to have a constructive trust imposed on the funds and other resources that Turner transferred to Benjamin and any profits that Benjamin and Temptu generate from pursuing the Turner Plan."  (Compl. ¶ 61).  Under New York law, a constructive trust will not be imposed absent a finding of unjust enrichment, *In re First Central Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004), and so this request is denied.

to make any inference of fraud . . . unequivocal." (ellipsis in original) (internal quotation marks omitted)).[4]

Here, Turner alleges that "Benjamin deceptively led Turner to believe that he intended to be her partner, and in fact was her partner," by representing to her that "(1) he intended to proceed with her in their joint venture; (2) he intended to work with her to implement the Turner Plan; and (3) he intended equally to split profits from their joint venture." (Pl.'s Mem. in Opp'n 22; Compl. ¶ 69). A plaintiff cannot support a claim of fraudulent inducement, however, based on allegations that a defendant made "intentionally-false statements . . . indicating his intent to perform under the contract." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996); *see also Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007). Accordingly, Plaintiff's claim based on her allegations that Benjamin "intended" to be her partner is insufficient as a matter of law and is dismissed. *See Schwarz v. ThinkStrategy Capital Mgmt. LLC*, 797 F. Supp. 2d 439, 444 n.27 (S.D.N.Y. 2011).

To the extent that Plaintiff asserts that Benjamin misrepresented that he "in fact was her partner," this allegation is not sufficient to defeat Defendants' motion for summary judgment. As Defendants point out, it is "nonsensical and circular to argue that Plaintiff was fraudulently induced *to enter* into a partnership agreement with Benjamin by Benjamin's representation that he *was* her partner." (Defs.' Reply Mem. 8 n.11 (emphases added)). Further, in opposing Defendants' motion, Turner relies almost exclusively on her own conclusory affidavit (Pl.'s Mem. in Opp'n 23 n.111, n.112), which is insufficient to survive summary judgment. *See, e.g.,*

---

[4]      Defendants argue that Turner's fraud claims should be dismissed as duplicative of her contract claim. (*See* Defs.' Mem. in Supp. 20-21). But "'a fraud claim may be dismissed as duplicative only as against a defendant against whom the related contract claim is viable.'" *Sun Products Corp. v. Bruch*, 507 F. App'x 46, 48 (2d Cir. 2013) (quoting *Richbell Info. Servs. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 589 (App. Div. 1st Dep't 2003) (emphasis omitted)). Because Plaintiff's breach-of-contract claim has been dismissed, her fraud claims are not duplicative.

*Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004).  To the extent that she relies on statements Benjamin made in the course of their negotiations, these statements are all forward-looking statements of intent, referencing an agreement and company that had not yet been formed.  (*See, e.g.*, Turner Aff. ¶¶ 38-43).  Additionally, there is no evidence that any of the statements summarized in Turner's affidavit were material or, if they were misrepresentations, that Benjamin intended them to be so.  Furthermore, there is no evidence that Turner's reliance on these statements was reasonable, particularly considering that, as discussed above, Turner and Benjamin never formed a contract.  *See Psenicska v. Twentieth Century Fox Film Corp.*, 409 F. App'x 368, 371 (2d Cir. 2009) (noting that "[u]nder New York law, reasonable reliance is an essential element of fraudulent inducement").  For these reasons, Turner's fraud claims are dismissed.[5]

**E.  Unfair Competition**

Summary judgment is also appropriate for Turner's unfair competition claim.  To sustain a claim for unfair competition under New York law, a plaintiff must show that the defendant misappropriated the plaintiff's labors or expenditures and that the defendant displayed some element of bad faith in doing so.  *See, e.g.*, *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34-35 (2d Cir. 1995); *see also Metito (Overseas) Ltd. v. Gen. Elec. Co.*, No. 05 Civ. 9478 (GEL), 2009 WL 399221, at *13 (S.D.N.Y. Feb. 18, 2009) (explaining that bad faith is an essential element of an unfair competition claim).  Mere negligence or recklessness is

---

[5]     Plaintiff's fraudulent concealment claim fails for the additional reason that she has not established that Benjamin owed her any duty.  As discussed above, Turner has not established the existence of a fiduciary relationship between the parties and there is no evidence that Benjamin had "superior knowledge" of the parties' dealings that was unavailable to Turner.  *See Barbara v. MarineMax, Inc.*, No. 12 Civ. 0368 (ARR), 2012 WL 6025604, at *20 (E.D.N.Y. Dec. 4, 2012) (explaining that in business transactions, a party is ordinarily under no duty to disclose material facts unless: (1) there is a fiduciary relationship between the parties; or (2) one party has superior knowledge that is not readily available to the other party and that party knows the other party is acting on the basis of mistaken knowledge).

insufficient to sustain this claim; instead, a plaintiff must establish bad faith by showing that the defendant acted "out of a dishonest purpose." *Barbagallo v. Marcum LLP*, No. 11 Civ. 1358 (JBW), 2012 WL 1664238, at *8 (E.D.N.Y. May 11, 2012). Further, "bad faith cannot be found where a defendant's alleged misconduct represents nothing more than its having exercised its legal rights." *Tang v. Jinro America, Inc.*, No. 03 Civ. 6477 (CPS), 2005 WL 2548267, at *8 (E.D.N.Y. Oct. 11, 2005).

Here, Plaintiff has failed to adduce any evidence establishing that Defendants acted in bad faith. Turner bases her unfair competition claim on her allegation that "Benjamin hid from Turner that he was pursuing the consumer airbrush both individually for Temptu, and with Turner and Braimon." (Pl.'s Mem. in Opp'n 17). But there is no evidence that Benjamin was required to disclose this information and no evidence that Defendants misappropriated Turner's idea for the airbrush system with the intent to deprive Turner of business. Instead, the evidence demonstrates that Turner and Benjamin engaged in negotiations regarding a possible business venture, which was never formalized. Because there was no agreement between the parties, and no other legally cognizable bad faith alleged, Defendants' motion for summary judgment is granted as to Turner's unfair competition claim. See *Tang*, 2005 WL 2548267, at *9 ("Because I have previously concluded that no valid contract existed between Plaintiff and Defendants . . . ., Defendant's motion for summary judgment dismissing Plaintiff's unfair competition claim is granted."); *see also Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 45 (2d Cir. 1994) (holding that an unfair competition claim was properly dismissed where there was no finding of contractual breach).

## F.  Injunctive Relief and Laches

Finally, Turner requests that the Court enter "preliminary and permanent injunctive relief, enjoining and restraining Benjamin and Temptu's wrongful use of the Turner Plan, sale of the Home System, and other wrongful and unlawful acts."  (Compl. ¶ 99).  Because Defendants have been granted summary judgment on all of Plaintiff's claims, Plaintiff's motion for injunctive relief is also denied.  Further, because all of Plaintiff's claims fail, the Court need not, and does not, reach the issue of laches.  *See Sipajlo v. NYU Hospitals Ctr.*, No. 11 Civ. 9387 (CM), 2013 WL 390958, at *2 (S.D.N.Y. Jan. 29, 2013) (declining to reach defendant's laches argument after granting defendant's motion for summary judgment on the merits); *Finkelstein v. Mardkha*, 495 F. Supp. 2d 329, 343 n.3 (S.D.N.Y. 2007) (same).

**CONCLUSION**

For the reasons discussed above, Defendants' motion for summary judgment is GRANTED, and the Complaint is dismissed.  The Clerk of the Court is directed to terminate the motion (Docket No. 32) and to close the case.


SO ORDERED.

Dated: August 13, 2013
      New York, New York

JESSE M. FURMAN
United States District Judge